**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KENNETH JOHNSON**

**Plaintiff,**

**v.** **Civ. No. _________________**

**RODNEY PORTER, BYRON WESTER, STAN JORDAN, TONY BUDROW, JOHN BARRIENTES, SHAWN ROACH, CHRIS LEYVA, GEORGE LEBRETON, JEREMY KIRK, SCOTT RUSSELL, in their individual capacities; THE CITY OF HOBBS, THE BOARD OF COUNTY COMMISSIONERS FOR LEA COUNTY, and THE LEA COUNTY DRUG TASK FORCE,**

**Demand for Jury Trial**

**Defendants.**

**COMPLAINT**

**I. Introduction.**

1. Plaintiff Kenneth Johnson, an African-American citizen of Hobbs, New Mexico, was the victim of a corrupt effort by the Lea County Drug Task Force ("LCDTF") defendants, led by Defendants Porter and Wester, to falsely arrest him on drug charges and then send him to prison through a malicious prosecution, an effort that failed when a Lea County jury found Plaintiff not guilty in September 2016. Plaintiff was subjected to additional harassment several months after he was found not guilty of the drug charges when Defendants Kirk and Russell of the Hobbs Police Department subjected him to an unlawful seizure and search in April of 2017. This conduct by at least some of the Defendants was permeated by racial animus. Defendant Porter has a long history of such conduct.

2. Over the years, the Defendant Hobbs Police Department ("HPD") has been infected by discriminatory animus directed at minority citizens. *Marshall v. Lea County Regional Hosp.,et al.,*

345 F.3d 1157, 1168-69 and n. 13 (10th Cir. 2003); *Johnson, et al., v. City of Hobbs*, U.S. D. Ct. (D. NM) No. CIV 99-00348 MV/WWD--ACE. This pattern and practice has continued and includes an instance arising in 2016 where, *inter alia*, an African-American commercial truck driver was falsely arrested, called “nigger” and maliciously prosecuted by HPD Officer Shawn Glashaukas. This illegal conduct has become so pervasive that the Defendant HPD and Defendant Kirk are currently the subject of a race discrimination lawsuit brought by several former African-American officers and an Anglo officer who contend the Department and numerous officers, including Defendant Kirk, engaged in widespread discriminatory conduct toward African-American citizens and retaliated against them when they protested the unlawful conduct.

3. The injuries suffered by Plaintiff were a direct result of the unwritten custom and practice of the Hobbs Police Department, Lea County and its Task Force that permit or condone illegal searches, the false arrests, and malicious prosecutions of citizens, especially African-American and Hispanic citizens.

**II. Jurisdiction and Parties.**

4. Jurisdiction and venue are proper pursuant to 42 U.S.C. §§1331 and 1343. Plaintiff’s claims are brought pursuant to 42 U.S.C Section 1983 and 42 U.S.C Section 1981.

5. All of the parties reside or do business in New Mexico, and the acts complained of occurred within Lea County, New Mexico.

6. At all times material hereto, Plaintiff Kenneth Johnson was a resident of Hobbs, New Mexico.

7. At material times, Defendant Rodney Porter was employed as a police officer by the City of Hobbs, was assigned to the Lea County Drug Task Force, and acted under color of law and within the scope of his employment. He is sued in his individual capacity. Defendant Porter had a lengthy history of police misconduct prior to the incident at issue which, *inter alia*,

included failing a polygraph on the question of whether he had planted drugs on citizens, planting drugs in the home of a citizen in an effort to revoke that citizen's probation, and a federal civil rights jury finding that he had violated the Fourth Amendment rights of an African-American citizen. Some time after the September 11, 2015 arrest of Plaintiff, Defendant Porter joined the Defendant Lea County Sheriff's Department where he served as a Captain under Defendant Wester and headed Criminal Investigations for Defendant Lea County.

8. At all material times, Defendant Byron Wester was employed as a deputy sheriff by Lea County, served as the Commander of the Lea County Drug Task Force in 2015, and acted under color of law and within the scope of his employment. He is sued in his individual capacity. During August 2009, two citizens filed written complaints with the New Mexico State Police that Wester, then a State Police officer, had threatened to falsely arrest and shoot an unarmed citizen who had not committed any crime but who had gotten into a verbal dispute with Defendant in a parking lot. Not long afterwards, Defendant Wester left the State Police and was hired by the Defendant Lea County Sheriff's Department as a deputy sheriff. Some time after September 11, 2015, he was promoted to Sheriff by Defendant Lea County.

9. At all material times, Defendant Stan Jordan was employed as a police officer by the City of Eunice, was assigned to the Lea County Drug Task Force, and acted under color of law and within the scope of his employment. He is sued in his individual capacity.

10. At all material times, Defendants Tony Budrow, Shawn Roach, George Lebreton and John Barrientes were employed as deputy sheriffs by Lea County, assigned to the Lea County Drug Task Force, and acted under color of law and within the scope of their employment. Each defendant is sued in his individual capacity.

11. At all material times, Defendant Chris Leyva was employed as a police officer by the City of Lovington, was assigned to the Lea County Drug Task Force, and acted under color

of law and within the scope of his employment. Defendant is sued in his individual capacity.

12. At all material times, Defendants Jeremy Kirk and Scott Russell were employed as police officers by the City of Hobbs and acted under color of law and within the scope of their employment. Each Defendant is sued in his individual capacity.

13. Defendant City of Hobbs ("Hobbs") is a municipality within the State of New Mexico and was the employer of Defendants Porter, Kirk and Russell. Defendant Hobbs was responsible for the hiring, retention, training, supervision and discipline of subordinate officers, including the Defendants named in this paragraph.

14. Defendant Board of County Commissioners of Lea County ("Lea County") is the governmental entity responsible for the hiring, retention, training, supervision and discipline of its Deputy Sheriffs, including Defendants Wester, Barrientes, Lebreton, Roach and Budrow, and is the entity liable in suits for damages caused by Lea County employees.

15. Defendant Lea County Drug Task Force is an agency created by the City of Hobbs, Lea County, the City of Eunice, the City of Lovington, the Town of Tatum and the Town of Jal. Upon information and belief, Plaintiff alleges that Defendant Lea County served as the fiscal agent for the Lea County Drug Task Force and was responsible for managing and supervising the Drug Task Force.

## III. Background to the September 2015 False Arrest and Malicious Prosecution of Plaintiff.

16. Defendant Porter was fired by the Midland, Texas Police Department in 1995 in connection with the unlawful manner in which he dealt with drug charges involving 32 African-American and Hispanic citizens. Defendant repeatedly lied to his supervisors during the course of an internal affairs investigation, and was required to take a polygraph examination, and showed deception in the examination, *inter alia*, when he denied planting drugs on citizens. A termination letter from the Midland Chief of Police stated that he had "breached the integrity" of

the Department and that Defendant's "credibility and honesty" was "to be questioned."

17. Shortly after Defendant Porter was fired, Defendant City of Hobbs, with full knowledge of the circumstances surrounding Porter's termination from Midland, hired Porter as a police officer. Almost from the outset of his tenure in the Hobbs Police Department ("HPD"), Defendant Porter was the subject of numerous citizen complaints and lawsuits alleging unreasonable seizure, arrest without probable cause, filing false criminal charges, and race discrimination. One complaint concerned Porter's unlawful and racially-based strip search of eight African-American men on the basis of a search warrant that only authorized the search of a residence, resulting in a lawsuit and a settlement by Hobbs of $575,000. On at least two occasions the New Mexico Court of Appeals found that Defendant Porter violated the Fourth Amendment rights of several citizens. On one occasion, HPD found that Defendant Porter fabricated a story about an HPD major who was involved in conducting an internal affairs investigation against Porter.

18. Another of the complaints against Defendants Porter resulted in an almost $500,000 federal court jury verdict in favor of Jimmie Marshall, an African-American resident of Hobbs for the violation of Mr. Marshall's Fourth Amendment rights. The verdict included a $300,000 punitive damage award against Defendant Porter. Plaintiff was associated with Mr. Marshall, having been in a relationship with his daughter for close to 20 years and having lived with her for about six or seven years.

19. In addition to his conduct at the Midland Police Department, Defendant Porter also had a history of fabricating drug charges while at the Hobbs Police Department. During 2006, Defendant accompanied two Department of Corrections Probation and Parole officers to the residence of Cannon Levy. The two Probation and Parole officers conducted a search of Mr. Levy's apartment, including a search of all the drawers in a chest of drawers in his bedroom. No

drugs were found. Defendant Porter then went into the bedroom and came out with a bag of methamphetamine that he claimed to have "found" in one of the drawers previously searched by the two Probation and Parole officers. Relying on Porter's fraudulent conduct toward Mr. Levy, the District Attorney's Office attempted to revoke Mr. Levy's probation. At the probation revocation hearing Defendant Porter testified that he found the bag of drugs in Mr. Levy's drawer. The two probation and parole officers both testified that just prior to Porter's "search" they thoroughly searched the drawer at issue and there were no drugs there. The District Court refused to revoke Mr. Levy's probation.

20. Upon information and belief Plaintiff alleges that around 2007 or 2008, Defendant Porter searched a trailer located around Farquhar and Humble Streets in Hobbs, New Mexico with a warrant directed at Plaintiff. Upon information and belief, the search warrant was procured based on the false claim that a "confidential informant" had purchased drugs from Plaintiff. Plaintiff did not live at that house and was not present when the search occurred.

21. Around 2012, Defendant Porter was assigned to the Lea County Drug Task Force, a group of police officers, many of whom, like Porter, had checkered histories as police officers, including Defendant Wester, then employed with the Lea County Sheriff's Department.

22. While working at various jobs in the Hobbs, New Mexico area, Plaintiff suffered a serious injury while at work in 2010 and was disabled from work for two or three years. During this time period, Plaintiff lived much of the time in Oklahoma with family. Some time during 2013 or early 2014, Plaintiff returned to Hobbs.

23. Around May 24, 2014, Defendants Porter and Budrow falsely claimed a "confidential informant" made a purchase of cocaine from Plaintiff at 1200 East Broadway, Apt. No.111, Hobbs, New Mexico. Defendant Budrow procured a search warrant to search an apartment that he falsely claimed was Plaintiff's residence. In fact, the apartment belonged to a

friend of Plaintiff's. Plaintiff did not live there, had never lived there, and never sold drugs from there. Plaintiff was not present at the apartment, nor was the tenant of the apartment present when Defendants Porter, Budrow, and other members of the Task Force entered the apartment. A female guest of the tenant was present and was arrested on an outstanding warrant unrelated to the search warrant. No other criminal charges resulted from the incident.

## IV. The Facts Regarding the September 11, 2015 Arrest and Malicious Prosecution of Plaintiff.

24. Defendants Porter, Wester, along with other defendant members of the LCDTF, were determined to arrest Plaintiff and send him to prison. On September 10, 2015, Defendant Porter submitted an affidavit for a search warrant to search the apartment at 1200 East Broadway, No. 108, a location where Defendants knew Plaintiff's two young children lived with Plaintiff's ailing mother. Defendant Porter procured the search warrant by falsely stating that: 1) a confidential informant had contacted him and said he was willing and able to buy methamphetamine from Plaintiff at the above address where the supposed informant stated Plaintiff lived; 2) Porter and Defendant Jordan met with and provided LCDTF funds to the supposed confidential informant for the buy; and 3) Porter watched the alleged informant as he/she entered and exited 1200 East Broadway, No. 108 where the informant supposedly bought drugs from Plaintiff that Porter claims were Ecstasy. The alleged Ecstasy Defendant Porter claims was purchased from Plaintiff was never sent to the Crime Lab for analysis.

25. On the morning of September 11, 2015, as he did virtually every day, Plaintiff picked up his young son at 1200 East Broadway, Apt. 108, and drove him to school. At approximately 8:00 a.m., after he had dropped his son off, Plaintiff was pulled over by Defendant Wester. At the time Plaintiff was pulled over by Defendant Wester, he had not committed any driving offense that would have given Defendant probable cause or reasonable suspicion to detain him. Defendant Wester falsely told Plaintiff that he was being stopped

because he was a suspect in a hit and run accident that had occurred at an Allsup's in Hobbs that morning and ordered Plaintiff to exit the car. In fact, no such incident had occurred and Defendant Wester lied to Plaintiff as a pretext to detain him prior to the execution of the search warrant at his mother's apartment.

26. It was daylight at the time Defendant Wester detained Plaintiff and Plaintiff was alone. There was no warrant to arrest Plaintiff. Plaintiff was compliant with Defendant Wester, did not resist Defendant or attempt to flee, was unarmed, had no history of forcibly resisting or fleeing from police officers, and had no history of violent behavior. Yet, in the absence of any evidence of any type of threat posed by Plaintiff, Defendant Wester proceeded to handcuff Plaintiff. Plaintiff's hands were put up behind his back and Wester applied the handcuffs in a manner which caused Plaintiff to suffer pain in his wrists and shoulder area. Defendant Wester, acting without consent, then conducted a warrantless search of the car. No contraband was found.

27. In the absence of any evidence that Plaintiff was armed and in the absence of any evidence of threatening behavior, Defendant Wester then conducted a pat down search of Plaintiff Not only did Plaintiff have no history of violence, but the language of the Operational Plan for the execution of the search warrant prepared by Defendants demonstrates that Defendants had no information showing that Defendants thought Plaintiff had a history or posed a threat of violence. Wester did not find any weapon on Plaintiff.

28. Under the totality of the circumstances, the use of handcuffs, the pat down search, and the search of the vehicle were unreasonable.

29. Two unmarked police cars then drove to where Defendant Wester had detained Plaintiff. Defendant Porter, who was the Case Agent, exited from one of the two police cars. Defendant Porter told Plaintiff they had a warrant to search him and his residence, Apartment

No. 108 at 1200 East Broadway.

30. Defendants were aware that Plaintiff's mother, who was in extremely poor health and required oxygen to breathe, and young daughter lived at the apartment. Prior to detaining Plaintiff, Defendants decided they would detain him prior to executing the search warrant, get him to assist them in entering the apartment and, if he did not agree to do so, they would knock and break down the door if Plaintiff's mother did not respond quickly enough for their satisfaction. At some point prior to entering Apartment No. 108, Defendant Porter told Plaintiff they wanted Plaintiff to assist them in the entry by entering the house with them and informing his mother and daughter what Defendants were there to do, in order to try to avoid frightening them. Faced with this choice, Plaintiff was coerced into doing so.

31. The apartment had one bedroom and a living room. Plaintiff went through the front door with Defendant Porter, holding his shirt from behind. Plaintiff told his mother what was happening, then Defendants took Plaintiff, his mother and his daughter outside the apartment. Defendant Porter, Defendant Wester and/or a third Defendant remained or went back inside the apartment where they stayed for five or ten minutes before going back outside.

32. Defendant Barrientes, who was a K-9 officer, then brought "K-9 Rocky" into the apartment. K-9 Rocky was a highly trained drug sniff dog with tremendous smell power. The success rate narcotics dogs have for determining the presence of drugs has been recognized by courts as being "well above 90%" and some studies have found such dogs are incorrect only 1-2 percent of the time. While false positive results sometimes occur, *inter alia*, because a dog likes to please its master or a drug had been present but was recently moved, a false negative – where a trained dog fails to detect narcotics that are present in the area with the dog – almost never occurs, especially when the scent of the narcotics is not concealed by any substance that has a strong smell, such as coffee. Here, the apartment was very small. Defendant Barrientes took K-

9 Rocky around the entire apartment. After about 10 minutes of sniff searching, K-9 Rocky did not detect the presence of any drugs and Defendant Barrientes took the dog back outside. The reason the K-9 did not detect any drugs in the apartment is because there were none in the apartment.

33. After learning that the K-9 had not detected any drugs, Defendants Porter and Wester, along with one or two other defendants, went back inside the apartment. Once inside, Defendant Porter and Defendant Wester conspired to and did place a plastic bag of methamphetamine inside a record player that belonged to Plaintiff's mother. Defendant Wester then "found" the drugs. The drugs were contained in a plastic bag and were not concealed in any way by any substance that might have distracted the K-9. Moreover, the record player was on a shelf at about the level of the dog's nose in the small living room. Defendant Porter took photographs of the bag and took it as "evidence."

34. Plaintiff was then arrested. Defendants Porter and Wester instigated the blatant overcharging of Plaintiff, by charging him with trafficking methamphetamine, which is a substantially more serious charge than mere possession. Plaintiff was taken to jail. He was facing 19 years in prison if found guilty of the charges. Unable to make the high bond, Plaintiff remained in jail for 11 days. Because Plaintiff was in jail, he was unable to report to his employment and was terminated on or about September 15, 2015 for failing to report to work.

35. One or two other defendants, whose identities are not yet known, were inside the apartment at the time Defendant Wester "found" the drugs. Those defendants that were in the living room area and who were watching Wester and/or Porter knew that there were no drugs inside the apartment prior to Defendants Porter and Wester entering after the K-9 search and conspired with these Defendants to remain silent about what had been done or otherwise failed to intervene to stop this and acquiesced in the unlawful placing of "evidence" inside the record

player.

36. Defendant Porter claimed that two bags of methamphetamine were found, and that he weighed them as being 149 grams of methamphetamine. He sent the entire amount of drugs to the Crime Lab for analysis. Yet, the June 9, 2016 report from the Crime Lab stated the drugs submitted by Defendant Porter weighed only 139.59 grams.

37. Defendant Porter chose not to take fingerprints on the bags, from the "find," but to have a DNA test done instead. The DNA test concluded that Plaintiff's DNA could not be matched to that on the bags. Moreover, the DNA results showed that it was more likely that the DNA on the bags came from a Caucasian person than from an African-American. Plaintiff is African-American and Porter and Wester are both Caucasian. In view of these results, the prosecution did not even put the DNA test results into evidence at Plaintiff's trial.

38. Defendant Porter was interviewed by Plaintiff's attorney prior to Plaintiff's criminal trial and was asked if he was "familiar with the defendant prior to this incident." To try to hide his ongoing effort to pin something on Plaintiff, Porter falsely replied: "I think I've run into him a time or two." In fact, Defendant Porter had been investigating Plaintiff intensely over the four-month period prior to the execution of the search warrant on September 11, 2015.

39. In another effort to distance himself from what he had done to Plaintiff, Defendant Porter falsely testified at trial that he was not even inside the apartment at the time drugs were "found" by Defendant Wester. He falsely testified that he was outside the apartment "interviewing" Plaintiff when Defendant Wester called him to go inside and take photographs. In fact, Defendant Porter was inside the apartment in the immediate area where the drugs were "found" and never interviewed Plaintiff. Defendant Wester admitted at trial that Porter was inside the apartment at the time Wester supposedly found the drugs.

40. On or about August 22, 2016, Plaintiff was taken to trial before a Lea County

jury. Because there was no evidence whatsoever to support the drug trafficking charges falsely instigated by Defendants Porter and Wester -- such as ledgers, money, scales or other evidence of drug trafficking -- the district court dismissed the trafficking charge after the close of the prosecution's case. Subsequently, the jury found Plaintiff not guilty of possession of methamphetamine. The charges, filed without probable cause and with malice, were disposed of in a manner favorable to Plaintiff.

**V. The April 2017 Unreasonable Detention and Search of Plaintiff.**

41. At 9:02 pm on April 9, 2017, Plaintiff was stopped by Defendant Russell while driving a car loaned to him by a friend, Robert Pace. Willie Chapple was a passenger in the car. The stop was made, according to Defendant Russell, because the brake light on the rear window of the car was not working. Plaintiff did not have his driver's license with him but promptly gave Defendant Russell his name and date of birth, which Defendant Russell called into dispatch at 9:07 pm. At 9:09:02, Defendant Russell received two printouts regarding Plaintiff, one of which showed that Plaintiff's otherwise valid driver's license had been suspended four days earlier for an alleged failure to pay child support, a fact about which Plaintiff was not aware.

42. Plaintiff was cooperative with Defendant Russell. Plaintiff was not impaired and had not driven in an improper manner, facts confirmed by HPD documents and the videotape of the stop. At the time of the stop, Defendant Russell had no specific, articulable evidence that any offense had been committed other than the alleged broken taillight. After running Plaintiff's driver's license, Defendant Russell had no specific articulable evidence that Plaintiff had committed any other offense except driving on a just-suspended license.

43. Despite the lack of any objective, specific articulable evidence, Defendant Russell had a "hunch" that narcotics were present in the car. At approximately 9:11pm, Defendant called Dispatch and asked that Defendant Kirk, the Hobbs Police Department K-9 officer, come

to the location of the stop. Thus, about 10 minutes after the stop, with no evidence of the presence of narcotics, Defendant Russell decided to have an open-air canine search conducted. A consequence of this decision was that Plaintiff was not released before Defendant Kirk arrived and conducted the open-air search of the vehicle.

44. The handwritten warning for "defective equipment" written by Defendant Russell shows that it was completed at 9:15 pm. The citation for driving on a suspended license shows it was written at 9:16 pm. Around this time, Defendant Russell told Officer Burke, who had arrived as back-up, that he wanted to detain Plaintiff until a K-9 search was done because, while "I can't put my hand on it," "something is not right."

45. Thus, instead of promptly giving Plaintiff the warning and citation to sign at 9:16 when they were completed, Defendant Russell unlawfully prolonged the detention until after Defendant Kirk arrived with his K-9. Defendant Russell sat inside his police unit and chatted with Officer Burke while he waited for the K-9 unit to arrive. According to the CAD reports, Defendant Kirk arrived at 9:20:16, along with Officer Ozuna.

46. The presence of these additional officers and the unlawful detention and K-9 search, when Defendant Russell and Burke were present for a routine traffic stop with a cooperative motorist, evidenced an animus against Plaintiff by the Defendant City of Hobbs Police Department.

47. Shortly after Defendant Kirk arrived, Defendant Russell told him who the driver was, and that his license was suspended. Russell asked Kirk to conduct an open-air search for narcotics with his dog. Defendant Russell did not provide Defendant Kirk with any specific, articulable information that would have constituted reasonable suspicion to believe that drugs were in the car and Defendant Kirk did not ask for any such evidence.

48. Defendant Kirk knew Plaintiff and thought that at some time in the past Plaintiff

had been convicted of a crime and, without any evidentiary basis, falsely assumed Plaintiff was on probation for some offense.

49. At 9:20:56 pm Defendant Kirk went over to Plaintiff and spoke with him, looking inside the car with his flashlight as he did so. Defendant Kirk had his microphone turned off, in violation of Departmental procedure, so there is no recording of this nearly two-minute conversation. Plaintiff was not free to leave at this point as Defendant Russell had not yet given him the warning and citation. At 9:23 pm, Defendant Russell told dispatch to run information on the passenger, Mr. Chapple, although he had no articulable reason to believe Mr. Chapple had done anything unlawful.

50. At 9:24:10 pm, eight minutes after Defendant Russell had completed the warning and the citation, the dog began the open-air search. According to Defendant Kirk, the dog alerted "to the odor of narcotics inside the vehicle by displaying a change of breathing, change of body posture and sitting down." Because Defendant Kirk did not have his microphone on, it is not possible to tell if the dog sat down for that reason or because he was told to sit.

51. At 9:25 pm, shortly after the dog search began but nine minutes after the warning and citation were completed, Defendant Russell gave Mr. Johnson the warning and citation to sign. At 9:27 pm, Defendant Kirk asked Plaintiff for permission to search the car. Plaintiff told him that because it is not his car, he did not feel he could provide consent. Officer Kirk stated that he would get a search warrant for the car. Plaintiff and Mr. Chapple chose to remain at the scene until any warrant was obtained and executed because he did not want members of the Defendant City of Hobbs Police Department to search a vehicle driven by two African-Americans without anyone present to watch them. Plaintiff had already had drugs planted by the LCDTF.

52. Around 9:35 pm, Defendant Russell spoke with Municipal Judge Harrison about

obtaining a search warrant for the vehicle. Defendant's affidavit asked for a warrant to search the car for "any narcotics, any narcotics paraphernalia," based on the assertion that the K 9 had "alerted" to the "odor of narcotics" in the car. At 9:38 pm, Defendant Russell drove off, presumably to obtain the municipal judge's signature on a search warrant.

53. Hobbs Police Officer Jennifer Scheller was dispatched to take photographs of the car. According to her report, she responded to the scene at approximately 9:57 pm. The police videotape, shows that Officer Scheller stood around for at least seven minutes before she began to take photographs. In the process of photographing the car, Officer Scheller, with the approval, authorization and or acquiesce of Defendant Kirk, opened the passenger side door and went all the way inside the car. Thus, the search began before a warrant was obtained and/or present at the scene.

54. Defendant Russell submitted an affidavit for a search warrant which sought to search the vehicle Plaintiff was driving. The Municipal Judge issued a search warrant to Defendant Russell that authorized a search of those areas that Defendant Russell sought in the affidavit to be searched. Defendant Russell returned to the scene of the detention. The search warrant authorized a search between the hours of 6:00 am and 10:00 pm.

55. Based on the fact that Officer Scheller wrote that she arrived at 9:57 pm, the fact that the videotape shows that she stood around the car for at least seven minutes before she started taking photographs of the car, and the fact that photographing the car occurred before Defendant Kirk began to search it, Plaintiff alleges that the search commenced after 10:00 pm.

56. Plaintiff was never shown or given a copy of a search warrant as was required by law.

57. Approximately 11 minutes after the search of the car began, Defendant Kirk walked back to where Plaintiff and Mr. Chapple were standing while they awaited the

completion of the search of the car. Defendant Kirk told Mr. Chapple to "show" him what was inside his pants pockets and made Mr. Chapple empty his pockets for him. Defendant Kirk then ordered Plaintiff to empty his pockets and to take off his shoes and his socks and to lift up his shirt so Defendant Kirk could view his waist area. This was done to look for narcotics and not to look for a weapon since Defendant Kirk had no information whatsoever that Plaintiff was armed and no rational police officer would conduct a search for weapons at the end of an hour and a half detention rather than at the start. The examination of the contents of a Plaintiff's pockets and the order that he remove his shoes for Defendant Kirk to inspect (as well as the examination of Mr. Chapples's pockets) was a search within the meaning of the Fourth Amendment conducted in the absence of consent, without a warrant authorizing such a search, or the presence of any exception to the warrant requirement.

58. Approximately two minutes after the searches of Plaintiff and Mr. Chapple both men were told: "Ya'll free to go." The men got back into the car and drove away. No contraband of any sort was found.

59. Defendant Russell decided to have the K-9 search done well before Defendant Kirk arrived with the K-9. While Defendant Russell falsely claims in his Search Report that Defendant Kirk coincidently happened to arrive to simply "back up" Defendant Russell, CAD records and the videotape show that Defendant Russell specifically requested that Defendant Kirk (the K-9 Officer) come to the scene. Moreover, to the extent another officer was needed for back up, Officer Burke had arrived on the scene well before Defendant Kirk and his dog arrived.

60. Defendant Russell had no objective, specific, articulable evidence that there were drugs in the car or on Plaintiff and thus had no lawful basis to detain Plaintiff and the vehicle beyond the time it would have reasonably taken to write the warning and citation. Rather, Defendant Russell had mere "inchoate suspicions" and a hunch and even admitted to Officer

Burke that he did not know anything specific, but something just "didn't seem right." Nor did Defendant Kirk, at the time he participated in the continuing detention of Plaintiff, receive any information from Defendant Russell that amounted to reasonable suspicion to believe Plaintiff had committed any crime beyond the traffic violation.

61. A simple traffic stop involving the issuance of a warning and a citation does not reasonably take more than 7-10 minutes to complete and certainly does not take 22 minutes. Even with the delays caused by Defendant Russell's call for the K-9 unit and his conversing with a second officer who had arrived before the K-9 unit, the warning and the citation were completed 8 or 9 minutes before the dog search began. But Defendant Russell did not give Plaintiff the warning and citation until after the dog search began, thus Plaintiff was not free to leave prior to the arrival of Defendant Kirk and the K-9 search.

**VI. Municipal and Supervisory Liability Claims.**

62. Defendant City of Hobbs improperly hired and continued to retain Defendant Porter as a police officer despite his proven record of dishonesy and civil rights violations. Defendant City of Hobbs also impropery hired and retained Defendants Kirk and Russell. Defendant also failed to institute adequate procedures regarding the supervision and discipline of HPD's subordinate officers, including the named HPD officer Defendants.

63. Defendant City of Hobbs failed to provide proper training and/or failed to insure that the training provided was adequately understood regarding tasks which HPD officers commonly perform, including the circumstances under which searches, seizures and investigative detentions may lawfully occur and/or the fact that laws must be enforced in a non-discriminatory manner.

64. Defendant City of Hobbs maintained unwritten customs and practices which permitted or condoned the unlawful searches and seizures of persons, the filing of false charges

and/or subjecting citizens to disparately harsh law enforcement practices on account of their race. These customs and practices are demonstrated by the failure of these Defendants to properly investigate complaints from citizens alleging such police misconduct and by their failure to take adequate remedial action where misconduct has occurred. These customs and practices are further demonstrated by Defendants' practice of retaining or promoting officers who were the subject of judicial findings of unconstitutional conduct, and/or who were the subject of an inordinate number of citizen complaints and lawsuits alleging misconduct, and/or whose conduct evidenced a history of dishonesty and/ or of racial discrimination against African-Americans and other minority citizens.

65. Defendant Board of County Commissioners for Lea County and/or Defendant Lea County Drug Task Force improperly hired and retained Defendants Wester, Budrow, Roach, Lebreton and Barrientes. Defendant also failed to institute adequate procedures regarding the supervision and discipline of Lea County's and the LCDT's subordinate officers, including the Defendant officers named in this parapgraph.

66. Defendant Board of County Commissioners for Lea County and/or Defendant Lea County Drug Task Force failed to provide proper training and/or failed to insure that the training provided was adequately understood regarding tasks which Lea County and LCDTF officers commonly perform, including the circumstances under which searches, seizures and investigative detentions may lawfully occur and/or the fact that laws must be enforced in a non-discriminatory manner.

67. Defendant Board of County Commissioners for Lea County and/or Defendant Lea County Drug Task Force maintained unwritten customs and practices which permitted or condoned the unlawful search and/or seizure of persons, the filing of false charges, and/or subjecting citizens to disparately harsh law enforcement practices on account of their race.

These customs and practices are demonstrated by the failure of these Defendants to properly investigate complaints from citizens alleging such police misconduct and by their failure to take adequate remedial action where misconduct has occurred. These customs and practices are further demonstrated by Defendants' practice of hiring, retaining or promoting officers who were the subject of judicial findings of unconstitutional conduct, and/or who were the subject of an inordinate number of citizen complaints and lawsuits alleging misconduct. Such officers, including Defendant Wester and Captain John Martinez, were often placed on the Lea County Drug Task Force and then promoted after engaging in misconduct in that capacity.

68. Defendants City of Hobbs, Board of County Commissioners of Lea County and the Lea County Drug Task Force acted intentionally, willfully and/or with deliberate indifference to the rights of Plaintiff. The acts and omissions of these Defendants described above were a direct cause of the injuries suffered by Plaintiff.

**VII. Damages.**

69. As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Kenneth Johnson suffered a significant loss of his liberty, and violation of his federal constitutional rights and loss of income, he suffered and continues to suffer significant emotional pain, distress, humiliation, embarrassment and physical pain and suffering. Plaintiff's emotional distress has been signficantly exacerbated by the fact that the unreasonable seizure occurred in the presence of his mother and young child, causing him even more shame and humiliation.

70. Because of the intentional, willful, malicious and/or recklessly indifferent nature of the conduct of Defendants Porter, Wester and other individual defendants, Plaintiff each prays for an award of punitive damages against each of them.

**VIII. Federal Constitutional Claims.**

**Count I: Unreasonable Seizure and Search Against Defendants Wester, Porter, Other Defendant LCDTF Agents, City of Hobbs, Board of County Commissioners of Lea County and the Lea County Drug Task Force.**

69. Plaintiff incorporates by reference the allegations contained in the previous paragraphs herein. The initial September 11, 2015, detention from the time he was stopped for pretextual reasons up through the time he was arrested, including the use of handcuffs to detain him, and the search of Plaintiff's person and the vehicle were objectively unreasonable, violated clearly established law, and constituted a violation of Plaintiff's Fourth Amendment rights.

**Count II: Unlawful Search and Seizure Against Defendants Wester, Porter, All Other Defendant LCDTF Agents, City of Hobbs, Board of County Commissioners of Lea County and the Lea County Drug Task Force.**

70. Plaintiff incorporates by reference the allegations contained in the previous paragraphs herein. The September 11, 2015, arrest of Plaintiff was made in the absence of probable cause and along with the subsequent 11 days in jail Plaintiff spent constituted an unreasonable seizure of his person in violation of the Fourth Amendment. Likewise, the search of the apartment constituted an unreasonable search in violation of the Fourth Amendment.

**Count III: Malicious Prosecution Against Defendants Porter, Wester, City of Hobbs, Board of County Commissioners of Lea County and the Lea County Drug Task Force.**

71. Plaintiff incorporates by reference the allegations contained in the previous paragraphs herein. The criminal charges filed against Plaintiff were instigated by Defendants Porter and Wester, were filed in the absence of probable cause, with malice, terminated in a manner favorable to Plaintiff, caused him to suffer significant damages, and constituted a violation of his Fourth Amendment rights.

**Count IV: Unreasonable Seizure Against Defendants Russell, Kirk and City of Hobbs.**

72. Plaintiff incorporates by reference the allegations contained in the previous

paragraphs herein.

73. The continued seizure of Plaintiff on April 9, 2017, after the time it reasonably took to issue Plaintiff a warning and a citation for driving on a suspended license was undertaken in the absence of reasonable suspicion to believe he had committed a crime. Because there was no reasonable suspicion for the continued seizure, the seizure was unreasonable and violated Plaintiff's rights guaranteed to him under the Fourth Amendment to the United States Constitution.

**Count V: Unreasonable Search Against Defendants Kirk and City of Hobbs.**

74. Plaintiff incorporates by reference the allegations contained in the previous paragraphs herein. The April 9, 2017, search of Plaintiff was conducted in the absence of probable cause, consent or any exception to the search warrant requirement, was unreasonable and constituted a violation of his Fourth Amendment rights.

**Count VI: Fourteenth Amendment and 42 U.S.C. §1981Against Defendants Porter, Kirk and City of Hobbs.**

75. Plaintiff incorporates by reference the allegations contained in the previous paragraphs herein.

76. Some or all of the above described acts of Defendants Porter and/or Kirk were motivated, in whole or in part, by Plaintiff's race and violated Plaintiff's right to the equal protection of the law guaranteed by the Fourteenth Amendment and violated Plaintiff's right under 42 U.S.C. §1981 to the equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them for the violation of his constitutional and statutory rights as follows:

1. For compensatory damages in an amount to be determined by the trier of fact.

2. For punitive damages against the individual defendants in an amount to be

determined by the trier of fact.

3. For pre-judgment and post-judgment interest.

4. For attorneys fees and costs pursuant to 42 U.S.C. §1988.

5. For such other and further relief as the Court deems just and proper.

Respectfully Submitted,

s/Richard Rosenstock
Richard Rosenstock
1121 Paseo de Peralta
Santa Fe, NM 87501
(505) 988-5324 Fax: (505) 989-4844
richardosenstock@gmail.com

Daniel Yohalem
1121 Paseo de Peralta
Santa Fe, NM 87501
(505) 983-9433 Fax: (505) 989-4844
dyohalem@aol.com

Katherine Murray
P.O. Box 5266
Santa Fe, New Mexico 87502
(505) 670-3943
kemurraylaw@gmail.com

*Attorneys for Plaintiff*